**This Opinion is a
Precedent of the TTAB**

Hearing: October 29, 2013                                Mailed: July 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

\_\_\_\_\_

Trademark Trial and Appeal Board

\_\_\_\_\_

*In re ActiveVideo Networks, Inc.*

\_\_\_\_\_

Serial No. 77967395

\_\_\_\_\_

Lisa M. Tittemore of Sunstein Kann Murphy & Timbers LLP,
    for ActiveVideo Networks, Inc.

Dawn Feldman-Lehker,[1] Trademark Examining Attorney, Law Office 111,
    Robert Lorenzo, Managing Attorney.

\_\_\_\_\_

Before Bucher, Gorowitz and Masiello,
    Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

ActiveVideo Networks, Inc. (hereinafter "Applicant" or "ActiveVideo") seeks

registration on the Principal Register of the term **CLOUDTV** (*in standard character*

*format*) for the following goods and services:

> software for developing and publishing applications for
> viewing, displaying, selecting, browsing, customizing,
> organizing, searching and navigating audiovisual and

---

[1] Although Ms. Feldman-Lehker represented the Office at the Oral Hearing on October 29, 2013, Ms. Ingrid C. Eulin handled the earlier prosecution of this application on the United States Patent and Trademark Office's behalf.

multimedia content on a television, gaming console, mobile device or other network-connected display; computer e-commerce software to allow users to perform electronic business transactions via a video-on-demand service in International Class 9;

broadcasting of television programs and providing telecommunication connectivity services for transfer of images, messages, audio, visual, audiovisual, and multimedia works for viewing on a television, gaming console, mobile device or other network-connected display via a video-on-demand service via network-based media processing software in International Class 38;

provision of non-downloadable television and other audiovisual and multimedia content via a video-on-demand service via network-based media processing software in International Class 41; and

providing temporary use of online non-downloadable network-based media processing software for viewing, displaying, selecting, browsing, customizing, organizing, searching and navigating audiovisual and multimedia content on a television, gaming console, mobile device or other network-connected display; providing technical support consulting services regarding troubleshooting of network-based media processing software; product development consultation related to the design, development and implementation of network-based media processing services and software; providing temporary use of online non-downloadable network based media processing software for facilitation of purchases for viewing, displaying, selecting, browsing, customizing, organizing, searching and navigating audiovisual and multimedia content displayed on a television, gaming console, mobile device, or other network-connected display in International Class 42.[2]

---

[2] Application Serial No. 77967395 was filed on March 24, 2010. The service classes were initially based upon Applicant's claim of first use anywhere and use in commerce since at least as early as April 28, 2009; the software in International Class 9 was initially based upon Applicant's allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Act; on July 11, 2012, Applicant filed an Amendment to Allege Use (AAU) with respect to the goods in International Class 9 claiming first use anywhere and use in commerce since at least as early as December 20, 2011.

## I. *Prosecution History*

The Trademark Examining Attorney refused registration of Applicant's applied-for mark, **CLOUDTV**, on the ground that the term is merely descriptive of the Applicant's goods and services under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1), which prohibits registration of any term, which "when used on or in connection with the goods [or services] of the Applicant is merely descriptive … of them … ." Thereafter, registration was refused because the proposed mark appears to be generic as applied to the identified goods and services, and Applicant's claim of acquired distinctiveness pursuant to Section 2(f) of the Trademark Act was rejected accordingly.

After the initial refusal and Applicant's first response, the Trademark Examining Attorney issued a final refusal on the grounds that the asserted mark was merely descriptive. Thereafter, ActiveVideo filed this appeal, a request for reconsideration, and, in the alternative, provided evidence that the asserted CLOUDTV mark had acquired distinctiveness due to its usage in the marketplace.

With this submission, Applicant also provided the declaration of Edgar Villalpando, Applicant's Sr. Vice President of Marketing, including as an attached exhibit a photograph of Applicant's booth at the 2010 National Cable & Telecommunications



Association tradeshow, as shown above.[3] The appeal was suspended, and after a further refusal and response thereto in which ActiveVideo provided more evidence of the alleged recognition of CLOUDTV as a mark, the Trademark Examining Attorney continued the descriptiveness refusal and rejection of acquired distinctiveness evidence and also refused registration on the grounds that the asserted mark is generic. In response, ActiveVideo provided more evidence of the distinctive character of its asserted mark along with an Amendment to Allege Use for the listed goods in International Class 9. The Trademark Examining Attorney then issued a final refusal on the ground that the mark is generic, and alternatively, that the mark is merely descriptive and lacks acquired distinctiveness, and this appeal was resumed. The issues on appeal have all been thoroughly briefed.

Arguing vehemently against these refusals, Applicant contends that the Trademark Examining Attorney has not met the Office's burden of proving that **CLOUDTV** is generic, that the **CLOUDTV** mark is not even merely descriptive as applied to ActiveVideo's goods and services, and, in the alternative, that ActiveVideo has proven acquired distinctiveness for this term.

## II.    *Applicant's business*

The record shows that in early 2006, ICTV with its HeadendWare system acquired Switched Media with its InStream platform. Initially ICTV focused on offering web-driven, interactive television (iTV) fare, first demonstrating a

---

[3] Second Villalpando Dec. at ¶ 13; Ex. E to Second Villalpando Dec.

"personalized" video mosaic – a navigation application that creates "thumbnail" images of multiple video channels on one screen. The goal was to blend the quality of cable TV with the interactive nature and unlimited choices of "over-the-top" (OTT)[4] broadband video. In 2008, ICTV was renamed "ActiveVideo Networks," attempting to reflect its emphasis on becoming a service provider rather than a technology vendor. As listed above, ActiveVideo provides both software and software-based services. ActiveVideo's **CLOUDTV** software is included in Philips television sets and/or Blu-ray video players sold across the United States. The services involved in this appeal are made possible through a software platform that can be used by cable and satellite television providers to provide, in turn, interactive television content to television customers through the viewer's existing set-top-box (STB). In short, this is a form of "TV Everywhere" (TVE), a model that allows subscribers to watch what they want, when they want it and on any device – from TVs to PCs, tablets, smartphones and a growing number of other types of mobile devices.

### III.   *The Component Terms of CLOUDTV*

Applicant's alleged **CLOUDTV** mark is a compound term formed by combining the words "Cloud" and "TV." We first analyze the components as a step on the way to determining the distinctiveness (or lack thereof) of **CLOUDTV** as a whole. *See, e.g., 1800Mattress.com IP, LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1684 (Fed. Cir.

---

[4] As seen throughout this record, "over-the-top" content refers to the delivery of video, audio and other media over the Internet from third parties such as Netflix, YouTube, Hulu, etc. For example, see Applicant's response of December 11, 2011, 17 TSDR at 76 of 201.

2009) (explaining that the Board appropriately considered the separate meanings of "mattress" and ".com" when determining that the combination "mattress.com" was generic); *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 71 USPQ2d 1370, 1372 (Fed. Cir. 2004) ("In considering a mark as a whole, the Board weighs the individual components of the mark to determine the overall impression or the descriptiveness of the mark and its various components.").

### A. The Term TV

Applicant, in its appeal brief, did not contest the generic nature of the term TV for the goods and services involved herein. In addition, the Trademark Examining Attorney submitted for the record multiple definitions of "television," showing that "TV" is frequently used as a shorthanded designation for "television," including:

**tel·e·vi·sion** NOUN:
1. The transmission of visual images of moving and stationary objects, generally with accompanying sound, as electromagnetic waves and the reconversion of received waves into visual images.
2. a. An electronic apparatus that receives electromagnetic waves and displays the reconverted images on a screen.
b. The integrated audible and visible content of the electromagnetic waves received and converted by such an apparatus.
3. The industry of producing and broadcasting television programs. [5]

- o O o -

**television** noun
1. the system or process of producing on a distant screen a series of transient visible images, usually with an accompanying sound signal. Electrical signals, converted from optical images by a camera tube, are transmitted by UHF or VHF radio waves or by cable and reconverted into optical images by means of a television tube inside a television set
2. *Also called*: **television set**. a device designed to receive and convert incoming electrical signals into a series of visible images on a screen together with accompanying sound
3. the content, etc., of television programmes
4. the occupation or profession concerned with any aspect of the broadcasting of television programmes ⇒ he's in television
5. *(modifier)* of, relating to, or used in the transmission or reception of video and audio UHF or VHF radio signals ⇒ a television transmitter
**TV** [6]

- o O o -

---

[5] education.yahoo.com/, Office Action of August 6, 2012, 9 TSDR at 41-42 of 54.

[6] collinsdictionary.com/, Office Action of August 6, 2012, 9 TSDR at 43-46 of 54.

**television** *n*

- an electronic device that receives television signals and displays them on a screen
  Synonyms: … tv, tv set
  Type of: receiver, receiving system, set that receives radio or tv signals
- a telecommunication system that transmits images of objects (stationary or moving) between distant points
  Synonyms: television system
  Types: …
  Type of: telecom equipment, telecom system, telecommunication equipment, telecommunication system: a communication system for communicating at a distance
- broadcasting visual images of stationary or moving objects
  Synonyms: TV, telecasting, video [7]

The term TV in the mark, when considered in relation to the goods and services, conveys the dictionary meanings. All of Applicant's goods and services ultimately involve streaming images to some form of electronic device having a screen. Given contemporary changes in visual media involving "convergence" and interactive technologies, "TV" is understood variously as an object, a medium, content, a format, and/or an industry. We sometimes view television programming on a traditional receiving set, online, on "catch up,"[8] or even on a device that is not a TV at all. In any case, the content of the many articles that are included in this record in the field of streaming video to a multiplicity of screens, supports that "television" and its universally recognized short-hand designation – TV – names Applicant's products and services. Therefore, we find that "TV," standing alone, is generic for these goods and services.

---

[7] vocabulary.com/dictionary/, Office Action of August 6, 2012, 9 TSDR at 47-48 of 54. The Trademark Examining Attorney also provided dictionary entries from sources such as macmillandictionary.com/dictionary/, merriam-webster.com/dictionary/ and foldoc.org/.

[8] As used throughout this record, "Catch up TV" is simply a broad reference to video on demand which allows users to select and watch video when they choose to rather than having to watch at the time of broadcast.

### B.  The Term Cloud

Turning then to the word "cloud," the Trademark Examining Attorney included dictionary definitions of "cloud," "the cloud," and "cloud computing," as well as articles from the Internet showing usage of the term "Cloud TV" in a non-source-indicating manner:

**cloud computing** – definition   /ˈklaʊdˌkəmpjutɪŋ/
the use of computer programs that are on the Internet rather than on your own computer [9]

 www.netlingo.com

**cloud**
a.k.a. the cloud

Originally this was a term for the unpredictable part of a network that data travels through on its way to its final destination. In a packet-switched network, the physical path on which the data packet travels can vary from one packet to the next. In a circuit-switched network, the specific circuit can vary from one connection to the next.

It later morphed into "the cloud" - which refers to a style of computing in which dynamic, scalable and virtual resources are provided over the Internet. Known as cloud computing, it refers to services that provide common business applications online, which are accessed from a Web browser, while the software and data are stored on the servers.

See also: in the cloud, cloud computing [10]

*cloud*

*(1)* Also referred to as a *network cloud*. In telecommunications, a cloud refers to a public or semi-public space on transmission lines (such as T1 or T3) that exists between the end points of a transmission. Data that is transmitted across a WAN enters the network from one end point using a standard protocol suite such as Frame Relay and then enters the network cloud where it shares space with other data transmissions. The data emerges from the cloud -- where it may be encapsulated, translated and transported in myriad ways -- in the same format as when it entered the cloud. A network cloud exists because when data is transmitted across a packet-switched network in a packet, no two packets will necessarily follow the same physical path. The unpredictable area that the data enters before it is received is the cloud.

*(2)* See also *cloud computing*. [11]

---

[9] macmillandictionary.com/, Office Action of November 15, 2010, 21 TSDR at 50 of 71.

[10] www.netlingo.com/, Office Action of November 15, 2010, 21 TSDR at 36 of 71.

[11] webopedia.com/, Office Action of November 15, 2010, 21 TSDR at 38 of 71.

**cloud computing**  Noun

(*informal*, *computing*) Computing services provided over the Internet (or "cloud"), whereby shared resources, software, and information are provided to computers and other devices on demand. [12]



| *Cloud* |
|---|

A cloud is any switched network that provides service while hiding its functional details from its users. A user simply connects to the edge of the cloud, and trusts the network to handle the details of moving a signal or data across to its destination. The PSTN and the Internet are two well-known examples of cloud networks. [13]



**cloud ==>**
**cloud computing**
*<architecture>* A loosely defined term for any system providing access via the Internet to processing power, storage, software or other computing services, often via a web browser. Typically these services will be rented from an external company that hosts and manages them. [14]

The Trademark Examining Attorney also placed into the record a helpful primer on "cloud computing" taken from Wikipedia, on June 24, 2010, and again on November 15, 2010.[15]

Nonetheless, as to the connotation of the word "cloud," Applicant steers us toward several dictionary entries offering a different meaning, as follows:

**cloud**  \ˈklau̇d\
1 : a visible mass of particles of condensed vapor (as water or ice) suspended in the atmosphere of a planet (as the earth) or moon
2 : something resembling or suggesting a cloud: as
    *a*: a light filmy, puffy, or billowy mass seeming to float in the air <a *cloud* of blond hair> <a ship under a *cloud* of sail>

---

[12] en.wiktionary.org/, Office Action of November 15, 2010, 21 TSDR at 52 of 71.

[13] glossary.westnetinc.com/, Office Action of November 15, 2010, 21 TSDR at 41 of 71.

[14] foldoc.org/, *see* Office Action of June 24, 2010, 24 TSDR at 22 of 69.

[15] en.wikipedia.org/. In the context of the increasing significance of "the cloud" in recent years, we note in comparing the Wikipedia "references" listed in several discrete entries for "cloud computing" over the past several years how quickly this field is growing and changing. See 24 TSDR at 32-42 of 69 and 21 TSDR at 54-66 of 71.

> *b: (1)*: a usually visible mass of minute particles suspended in the air or a gas *(2)*: an aggregation of usually obscuring matter especially in interstellar space *(3)*: an aggregate of charged particles (as electrons)
>> *c*: a great crowd or multitude: swarm <*clouds* of mosquitoes>
> 3 : something that has a dark, lowering, or threatening aspect <*clouds* of war> <a *cloud* of suspicion>
> 4 : something that obscures or blemishes <a *cloud* of ambiguity>
> 5 : a dark or opaque vein or spot (as in marble or a precious stone)
> 6 : the computers and connections that support cloud computing <storing files in the *cloud*>[16]

> **cloud**  /klaʊd/ n
>> › a usually grey or white mass in the sky, made of very small drops of water:
>> › a mass of something such as dust or smoke that looks like a cloud:                    [17]

Applicant also included the definition of "cloud" from Wikipedia. Substantially all of this nineteen-page screen-print is a detailed discussion of the meteorological meaning of the word "cloud," containing only a single line as follows: "In computer science the term *Cloud* is often associated with Cloud Computing."[18]

As to the word "cloud" alone, Applicant is correct in pointing out that general dictionaries show that the standard definitions of the term "cloud" occur in a meteorological context (e.g., particles of condensed vapor suspended in the atmosphere) or often literary forms analogized thereto (e.g., "gathering *clouds* of war"). However, these connotations of the word "cloud" are irrelevant in this case inasmuch as the determination of whether a proposed mark is capable of achieving significance as a source identifier must be made in relation to the goods and services for which registration is sought, not in the abstract. *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); and *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir.

---

[16] merriam-webster.com/, Applicant's response of May 12, 2011, 20 TSDR at 22-23 of 57.

[17] dictionary.cambridge.org/us/, Applicant's response of May 12, 2011, 20 TSDR at 26 of 57.

[18] en.wikipedia.org/ as accessed by Applicant on May 12, 2011, 20 TSDR at 29-47 of 57.

2007). The fact that a term may have a different meaning in another context is not controlling. For this reason, we find the "cloud" entries from the specialty dictionaries as cited by the Trademark Examining Attorney to be the definitions that are most apropos to the manner in which "cloud" is used at the intersection of streaming video and interactive television.

In this context, Applicant charges that "[a] primary issue central to this case is the Examining Attorney's apparent misunderstanding of the nature of ActiveVideo's cutting edge goods and services … ." While we disagree with this allegation generally, we acknowledge that most of the excerpts the previous Trademark Examining Attorney included from Lexis/Nexis just

> … happen to have the words "cloud" and "tv" in proximity to each other, but otherwise are completely random and have absolutely no connection to the phrase CLOUDTV or the goods and services at issue here.

Applicant's brief at 9-10. For example, of the *one-hundred* quick excerpts from the Lexis/Nexis search results appended to the Office action of January 11, 2012 (15 TSDR), only *three* discrete news releases were relevant to the facts of this case:

(1) Story number 52 is a story about Applicant;

(2) Stories ##6, 11, 31, 32 and 100 are duplicative, but they do make a generic reference to "Cloud TV," which is relevant to our determination herein:
    **Liberty Global 2nd Screen iPad TV Application Developed by Intellicore**
    September 09, 2011
    AMSTERDAM--Intellicore, a developer of innovative IPTV & Cloud TV applications for iPad, is the company that developed the 2nd Screen application for Liberty Global's Horizon Project. The iPad application was shown during the IBC keynote session of Mike Fries, President & CEO of Liberty Global.

(3) Stories ##37, 86, 98 and 99 are duplicative, but again, they make a generic reference to "cloud TV," which is also relevant to the case at hand:
    **Referencing Strategy Analytics 2011 Predictions**
    Boston, MA - December 21 2010 – Will 2011 be the year of Facebook TV, CloudTunes and Wii2?
    Strategy Analytics' analysts have dug themselves out of snow drifts, put another log on the fire, and pooled their thoughts on the year ahead. Connected TV will not be going away, in spite of early glitches: Google, Apple and Microsoft may be joined by Facebook in the race to develop a world-beating cloud TV service…

Additionally, we agree with Applicant that some of the screen-prints drawn from third-party websites were totally unrelated to the case at hand.[19]

In any case, the entire record herein shows that in the field of computers and telecommunications, the "cloud symbol" (as shown in the images below, for example) has for decades represented a general computer network. It is interesting to note that in one source accessed by the Trademark Examining Attorney in June 2010 and again in November 2010, the cloud imagery still represented a general network as it has for decades. Yet that same entry currently labels the cloud as the Internet:

| Network Cloud (1998) | Contemporary Cloud (2013) |
| --- | --- |



[20]

Hence, while the Internet is not coterminous with "the cloud," the definitions of "cloud" reviewed above demonstrate that whether one focuses on multiple-system

---

[19] In addition to the weakness of the Lexis/Nexis evidence, not every website put forward by the Office during the prosecution of this application, wherein the word "cloud" preceded the term "tv," is relevant to the issues at hand. For example, the site tvcloud is "dedicated to beautiful clouds in the blue sky, Cloud-TV is a grandiose time-lapse project …" designed by one Jay Versluis, "a restless Creative Junkie, Plastic Shooter, Broadcast Professional and WordPress Guru"; "Cloud" is the name of a manga character in "Fung Wun," spcnet.tv; from learndevnow, one learns through videos the power of the Cloud; a file storage provider, cloudcovertv.com; and finally, unisys.com, Unisys Corp. produced a TV series on "the cloud," discussing where it believes things are now, and where developments in "the cloud" should be headed in the future.

[20] For example, see Office Action of November 15, 2010, 21 TSDR at 44 of 71; compare with COMPUTER DESKTOP ENCYCLOPEDIA (2013) as captured in the "cloud" entry of the online encyclopedia of thefreedictionary.com.

operators (MSOs), consumer electronics (CE) manufacturers, or web denizens, the term "cloud" will immediately be seen as generic for packet-switched computer networks that link distant servers to one's TV, computer or other smart devices having screens.

Citing to dictionary entries found in sources such as NetLingo and Webopedia, Applicant seeks to create ambiguity from the technical definitions of the word "cloud" by emphasizing language referring to the cloud, such as "the *unpredictable* part of a network." We disagree with these attempts by Applicant to demonstrate that "cloud" is an ambiguous term when considered in conjunction with its goods and services, and therefore not immediately descriptive or generic. In reality, this "unpredictable" language dates all the way back to the earliest days of the first packet-switched network, the ARPANet, having the earliest conception, architecture and design of the Internet as we know it, and is nothing more than an explanation of the way in which two or more related and inexorably linked data packets may follow quite different paths in the hidden parts of this packet-switched network as they both/all make their way to the same final destination.

Actually, Applicant concedes that "[t]erms such as *Cloud*, Internet, Web, and computer network are fully available for use. *In re Seats,* [*Inc.,* 757 F.2d 274, 225 USPQ 364, 368 (Fed. Cir. 1985)]." Applicant's brief at 19 (*emphasis* supplied). We agree with Applicant on the narrow point that no one in Applicant's field can claim exclusive rights in the term "cloud."[21] This conclusion is entirely consistent with all

---

[21] However, we note that Applicant later states, in what appears to be a contradictory position, that "Here, the individual terms ["cloud" & "tv"] are not generic for software for

of the dictionary definitions made of record. From Applicant's own website, we see the importance of the "cloud" to its goods and services. Applicant's many press releases and subsequent articles about its products repeatedly use terms like "the Internet cloud" "Television in the cloud," industry-leading "cloud-based platform," "an application platform in the cloud," "moving the TV-viewing experience to the cloud," "distribute content from the cloud," "the network cloud," benefits of "cloud-based processing," "cloud-based UIs," "total cloud," "doing the heavy processing in the cloud," and "advanced TV software platform based entirely in the cloud."[22]

In support of registration, Applicant argues that the United States Patent and Trademark Office has permitted numerous similar marks for computer software and related services to be registered by third-parties, such as the following:

| **GLOBAL CLOUD** | for "computer services, namely, global computer network development, web site design, web site consulting, database design development, and computer middleware development" in International Class 9;[23] |
|---|---|
| **THE CLOUD** | for "marketing and promoting the goods and services of others via a wireless network" in International Class 35; "text and numeric wireless digital messaging services" in |

---

interactive television … ." Applicant's reply brief at 6. This would also seem to be a different approach than seen above when discussing the degree of descriptiveness (or distinctiveness) of the term "tv," where we noted that Applicant, in its initial appeal brief, did not contest the generic nature of the term "tv" for the goods and services involved herein.

[22] Our primary reviewing court has made clear that the way an applicant uses an alleged mark (or a component term in a mark), or the goods and services in connection with which it uses the alleged mark, in promotional materials or packaging, is relevant to whether consumers will perceive the mark as an indicator of source or instead as descriptive or generic. *See, e.g.*, *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1220 (Fed. Cir. 2012); *In re Reed Elsevier Properties Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1380-81 (Fed. Cir. 2007); *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001); *In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 92 (CCPA 1980); *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978).

[23] Registration No. 2566720 issued on May 7, 2002, renewed.

| | |
|---|---|
| | International Class 38;<br>"hosting of digital content on the Internet" in International Class 42;[24] |
| **CLOUDCORE** | for "providing temporary use of on-line non-downloadable software for development and customization of software for use in integrated open source computer software platforms and related computer systems" in International Class 42;[25] |
|  | for "technical consulting services in the field of cloud computing" in International Class 42;[26] |
| **CLOUD ATTACHED STORAGE** | for "embedded computer servers; data storage management software; computer network storage devices, namely, storage subsystems for storage and backup of electronic data either locally or via a telecommunications network; networking software, namely, software for setting up and configuring managed storage and online backup services over wide area networks; computer software and hardware for synchronizing and connecting local network storage and global computer networks; computer storage appliances, namely, network attached storage devices for file sharing and cloud backup; computer hardware and software for storing and managing data on local and internet-based file servers" in International Class 9;<br>"providing online, non-downloadable computer software for use in storing and managing the computer data of others; data encryption services for others; back-up services for computer hard drive data; computer services, namely, data recovery services; data synchronization services in the nature of data recover services; providing a web site either locally or via a telecommunications network featuring technology that enables internet users to publicly share data; hosting an on-line web site featuring storage solutions" in International Class 42;[27] |
| **Cloud Computing** | for "computer software for management and security for cloud |

---

[24] Registration No. 3028364 issued on December 13, 2005; Section 8 affidavit accepted. Presumably in the ten years since this application was examined, "the Cloud" has taken on a whole new meaning!

[25] Registration No. 3047206 issued on January 24, 2006.

[26] Registration No. 3739774 issued on January 19, 2010. No claim is made to the exclusive right to use the words "Cloud Computing Consultants I.T." apart from the mark as shown.

[27] Registration No. 3759519 issued on the Supplemental Register on March 9, 2010. No claim is made to the exclusive right to use the words "Attached Storage" apart from the mark as shown.

| | |
|---|---|
| **Made Easy** | computing" in International Class 9;<br>"providing on-line non-downloadable software for management and security for cloud computing" in International Class 42;[28] |
| **THE WORLD'S MOST SECURE & RELIABLE CLOUD COMPUTING** | for "providing access to virtual computing resources, hosted operating systems and computer applications through a global computer network and organizational networks; computer services, namely, providing access to virtual computing environments of variable capacity, consisting of virtualized computer hardware, computer software, Internet connectivity, computer and network security, and data storage facilities through a global computer network and organizational networks" in International Class 38; "providing technical support services, namely, troubleshooting and daily operational support of virtual computing environments and their core components which include computer hardware, computer software, Internet bandwidth, networking hardware and software, security hardware and software, and data storage systems" in International Class 42;[29] |
| **CLOUD ASSURE** | for "application service provider (ASP) featuring software that provides security measures, performance tests and availability monitoring for software applications delivered and consumed over the Internet; computer software services, namely, technical support for computer software problems, remote management of computer applications for others" in International Class 42;[30] |
| **CONNECT THE CLIENT & THE CLOUD** | for "communication services, namely, electronic transmission of data and documents among users of computers" in International Class 38;<br>"storage services for archiving databases, images and other electronic data of others" in International Class 39;<br>"computer services, namely, managing data, software applications, and computer settings on individual and business computer systems; remotely monitoring the status of users' and businesses' data and systems; providing continuous backup, persistent file sharing, remote access, disaster recovery, synchronization between computers, and security, with automatic updating, eliminating the need for manual interventions; maintaining data synchronized on local computing environments and on virtual environments on Internet storage; enhancing file creation, file editing, file deletion, file organization, work groups, and portable computing; providing security and restricting access and visibility of user data; providing redundant data centers, website training and education, and computer service support" in International Class 42;[31] |

---

[28] Registration No. 3762495 issued on March 23, 2010.

[29] Registration No. 3766255 issued on March 30 2010. No claim is made to the exclusive right to use the phrase "Secure & Reliable Cloud Computing" apart from the mark as shown.

[30] Registration No. 3815430 issued on July 6, 2010.

[31] Registration No. 3817520 issued on July 13, 2010.

| | |
|---|---|
| **Lift your company to the cloud** | for "cloud computing featuring software for use in the services industries for order management, client and vendor relationship management, business process automation, document management services, document storage services, data storage services, data transformation services, messaging services, social networking services, reporting, business intelligence, data warehousing, e-commerce, electronic payment and settlement; software as a service and platform as a service for use in the management of the valuation life cycle of real estate property, featuring computer software platforms for the fulfillment, creation, edition, assignment, engagement or deletion of real estate property valuations or appraisals, valuations or appraisal reports, value or appraisal reconciliations, valuation or appraisal reviews, data modeling, management of panels of appraisers; consulting in the field of information technology; consulting services in the field of cloud computing; computer services, namely, remote and on-site management of the information technology (IT) cloud computing systems of others; providing a web site that features information on computer technology and programming" in International Class 42;[32] |
| **THIS IS YOUR CLOUD** | for "electronic data storage services, namely, storing electronic data at data centers; computer services in the nature of providing an integrated suite of data and computer related services, namely, electronic data storage" in International Class 39; "computer services in the nature of providing an integrated suite of data and computer related services, namely, providing computer security consulting in the area of data storage, online security and information security vulnerability; computer services in the nature of monitoring and managing computer network systems; network security services in the nature of computer network security services, namely, restricting access to and by computer networks to and of undesired web sites, media and individuals and facilities; security management services, namely, computer consultation in the field of computer security; disaster recovery services, namely, computer disaster recovery planning and recovery of computer data; server management services, namely, hosting the web sites of others on a computer server for a global computer network; data backup services, namely, back-up services for computer hard drive data; web site hosting services; computer services, namely, remote and on-site management of the information technology cloud computing systems of others; technical support services, namely, remote and on-site infrastructure management services for monitoring, administration and management of public and private cloud computing and application systems; consulting services in the field of cloud computing, namely, consulting in connection with cloud computing applications and networks; technical consulting services in the fields of public and private cloud computing, namely, consulting services in the field of design, selection, implementation and use of computer hardware and software systems for others; technical support services, namely, monitoring of network systems, |

---

[32] Registration No. 4050775 issued on November 1, 2011.

| | |
|---|---|
| | servers and web and database applications and notification of related events and alerts; providing on-demand resource allocation for computer systems including access to virtual servers and virtual machines; hosting the software and other computer applications of others on a virtual private and public server; technical support services for hardware, software and operating systems in the nature of monitoring, diagnosing and problem resolution related to software applications; computer services, namely, remote and on-site management of electronic messaging systems of others including troubleshooting, optimizing, patching, hardening, storage management, mailbox movement, installation and configuration and migration of electronic messages and message systems, such as e-mail" in International Class 42;[33] |
| **Powering The Cloud** | for "computer application software for mobile devices, social media in the nature of web and mobile technologies, electronic commerce activities and web sites, namely, platform as a service featuring computer software platforms that run on a cloud computing infrastructure for providing short messaging services, electronic mail, interactive voice response commands, communication streams, web site postings, mobile payments over QR codes and near field communications, electronic payments, credit card services, reading QR codes, cloud storage, providing personal notifications, and location based service and wireless content delivery" in International Class 42;[34] |
| **OUR SOFTWARE, YOUR CLOUD** | for "computer software for management of information technology (IT) infrastructure as cloud computing" in International Class 9;[35] |
|  | for "computer services, namely, cloud hosting provider services; computer services, namely, integration of private and public cloud computing environments; consulting services in the field of cloud computing; IT consulting services; providing virtual computer systems and virtual computer environments through cloud computing; technical consulting services in the fields of datacenter architecture, public and private cloud computing solutions, and evaluation and implementation of internet technology and services; technical support services, namely, remote and on-site infrastructure management services for monitoring, administration and management of public and private cloud computing IT and application systems" in International Class 42;[36] |
| **RIBBON CLOUD** | for "cloud computing featuring software for use in assessing, migrating and monitoring on-premise applications to cloud-based |

---

[33] Registration No. 4115833 issued on March 20, 2012.

[34] Registration No. 4120827 issued on April 3, 2012.

[35] Registration No. 4157268 issued on June 12, 2012.

[36] Registration No. 4160045 issued on June 19, 2012. No claim is made to the exclusive right to use the phrase "Cloud Computing Technologies" apart from the mark as shown.

| | |
|---|---|
| | alternatives; computer services, namely, remote and on-site management of the information technology (IT) cloud computing systems of others; computer services, namely, remote management of and on-site management of cloud computing systems and applications for others; consulting services in the field of cloud computing; technical consulting services in the fields of datacenter architecture, public and private cloud computing solutions, and evaluation and implementation of internet technology and services; technical support services, namely, remote and on-site infrastructure management services for monitoring, administration and management of public and private cloud computing IT and application systems" in International Class 42;[37] |
| **cloud outside the box** | for "cloud computing featuring software for use in data back-up, data-base management and application failover; cloud seeding; computer services, namely, cloud hosting provider services; providing virtual computer systems and virtual computer environments through cloud computing" in International Class 42;[38] |
| **TALKIN' CLOUD** | for "blogs featuring news, information and commentary in the field of cloud computing" in International Class 41; and "providing a website featuring information, news and commentary in the field of cloud computing; providing information in the field of cloud computing" in International Class 42.[39] |

As noted by the Trademark Examining Attorney,[40] the listed third-party registrations present different circumstances on their face. For example, they

---

[37] Registration No. 4161062 issued on June 19, 2012. No claim is made to the exclusive right to use the word "Cloud" apart from the mark as shown.

[38] Registration No. 4163716 issued on June 26, 2012. No claim is made to the exclusive right to use the word "cloud" apart from the mark as shown.

[39] Registration No. 4163727 issued on June 26, 2012. No claim is made to the exclusive right to use the word "Cloud" apart from the mark as shown.

[40] With respect to the third-party registrations Applicant refers to in its brief (at 12-13), the Trademark Examining Attorney requests that we disregard this evidence, citing, *inter alia*, to *In re Luxuria s.r.o.*, 100 USPQ2d 1146, 1147-48 (TTAB 2011); *In re Giovanni Food Co.,* 97 USPQ2d 1990, 1990-91 (TTAB 2011); *In re Van Valkenburgh,* 97 USPQ2d 1757, 1768 n.32, 1769 (TTAB 2011); and TBMP §§ 1203.02(e), 1207.01. However, a detailed table, containing substantially the same information as shown in the table above, was included within Applicant's submission of July 11, 2012. Copies of the registrations (or the complete electronic equivalent from the United States Patent and Trademark Office's automated systems) were never provided by Applicant. However, in the Office's continuing refusal of August 6, 2012, the Trademark Examining Attorney explicitly countered the substance of these references but failed to advise Applicant that this detailed list does not make the registrations of record. Accordingly, we find that the Trademark Examining Attorney

include registrations in which the term "Cloud" is disclaimed. Furthermore, consistent with United States Patent and Trademark Office examination guidelines, disclaimers are not required when the word is part of a slogan, as are the majority of these examples. Finally, we are not bound by the decisions of Trademark Examining Attorneys to approve proposed marks for publication, and whether a proposed mark is generic must be determined based on the evidence of record at the time registration is sought. *Nett Designs*, 57 USPQ2d at 1566; *Nextel Communications Inc. v. Motorola Inc.*, 91 USPQ2d 1393 (TTAB 2009) and *In re Sunmarks Inc.*, 32 USPQ2d 1470 (TTAB 1994); *see also In re Chippendales, USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010). As seen in related fields involving high-technology goods and services characterized by rapid innovation and remarkable transformation, we are witnessing a dizzying proliferation of myriad forms of online video streaming, interactive television and video on demand. Not surprisingly, the quickness with which changing nomenclature is introduced into the marketplace by manufacturers and merchants, and then adopted by customers, is equally brisk. Accordingly, the location of a new term on the spectrum of distinctiveness is anything but static. The USPTO has, and must have, the freedom, over a period of decades – or increasingly, just *years* – to consider such questions anew whenever the evidence compiled in a new, unique

---

waived her objection to the admissibility of these references. *See In re City of Houston*, 101 USPQ2d 1534, 1536 (TTAB 2012), citing *In re Broyhill Furniture Indus. Inc.*, 60 USPQ2d 1511, 1513 n.3 (TTAB 2001))). *See also In re Hayes*, 62 USPQ2d 1443, 1445 n.3 (TTAB 2002); *In re 1st USA Realty Professionals Inc.*, 84 USPQ2d 1581, 1583 (TTAB 2007); and *In re Boyd Gaming Corp.*, 57 USPQ2d 1944, 1945 n.4 (TTAB 2000). In view thereof, we have considered the list and the detailed information provided during examination.

record reflects such dynamic changes. *See, e.g.*, *De Walt, Inc. v. Magna Power Tool Corp.*, 289 F.2d 656, 129 USPQ 275, 279 (CCPA 1961) ("Trademark rights are not static. A word or group of words not descriptive today may, through usage, be descriptive tomorrow.")

### IV. *"Cloud TV" in trade publications*

The Trademark Examining Attorney placed into the record[41] the following articles:

**Verizon Advances Video Agenda with ==Cloud TV==, iPad and FiOS TV Online**
By Jesse Ward   August 23, 2010

Verizon is extending its FiOS video service beyond the living room to tablets, PCs and mobile devices.
Late last week Verizon CIO Shaygan Kheradpir hosted an event in New York City and offered a sneak peek of new features coming soon for FiOS customers, as well as some of the company's long-term plans for FiOS TV. Verizon plans to offer live video programming as well as video-on-demand services to new platforms.

The service provider announced several new initiatives which rely on the concept of "==cloud TV==." Flex View gives customers the ability to rent, purchase and watch video-on-demand programming on FiOS TV, the PC and select mobile devices… .[42]

☼ ☼ ☼

**Cloud TV - The hunt for a new business model**
*by Diya Soubra, SCH Consulting,* 16th September 2011
*Last week, TechCrunch published an article [entitled "TV in the Cloud"][43] on ==Cloud TV== and declared to the world that "TV won't be the same unless it is online and connected to everything else. A show that can't be shared or linked will command less and less of our attention". So, if this statement is true, what is the TV industry doing to react? Does the industry even want to change?" SCH Consulting's Diya Soubra has been investigating.*

The television industry has now totally embraced the digital age. Whether we call it IPTV, ==Cloud TV==, Digital TV, OTT, VoD or anything else, the industry has completed a large step of continuous innovation in that space. The progress was highly visible at IBC, the trade fair for the television industry, which took place a few days ago.[44]

---

[41] In some cases, the same articles were submitted more than once, and sometimes by both the Examining Attorneys and by Applicant.

[42] ntca.org/, Office Action of June 6, 2011, 18 TSDR at 50-53, 107-08 of 129.

[43] "TV In The Cloud," by Erick Schonfeld, September 4, 2011, techcrunch.com/

[44] tech2news.info/, *see* Office Action of January 11, 2012, 15 TSDR at 20-22 of 36.

Serial No. 77967395

☼ ☼ ☼

**200 million reasons why Apple's upcoming TV will win the <mark>cloud TV</mark> wars**
  by Jon Stokes    09.19.11

> *Simultaneous with TV's rise as the premier content venue is a redefinition of the term "television" from "a device with a screen and a set of channels" to "a growing pool of cloud-hosted, episodic content that's generally available on any device with a color screen and a network connection."* — from [Leaving Las Vegas: a look back at CES 2011](#)

Today is a big day for <mark>cloud + TV</mark> news, but even more interesting (to me, at least) than the Netflix/Qwikster split is a new Businessweek article, "Here comes Apple's real TV." …

[B]arring some kind of crazy hologram technology …, it's unlikely that the hardware is really where Apple hopes to innovate, here. No, there's one place where Apple will not only innovate, but where the company also has an existing, very substantial edge over the competition: the <mark>cloud TV</mark> user experience.

But before I talk about the 200 million reasons why an Apple TV will be a formidable force in the TV market, here's some background to set the context …

If I could summarize all that I learned from all of this coverage in one super-long sentence, it would go something like the following: the traditional TV interface paradigm is that you browse finite collection of resources using as a guide some limited, easily managed pool of metadata that doesn't refresh too often; but to navigate "TV" as it has been redefined by the cloud, you need to be able to query an infinitely larger, dynamic pool of metadata that indexes an infinitely larger resource pool.

Instead of a browse paradigm, <mark>cloud TV</mark> will work under a query paradigm, for which you need a rich, capable interface that lets you construct queries and filter the results. Google's answer to this has been to turn the remote into a full-blown keyboard. Others like LG are looking to a purely pointer-based interface. Then there's Microsoft's Kinect, which uses gestures and voice to the same end. None of these four approaches—keyboard, pointer, gesture, or voice—is perfectly suited for a living room-based, "10-foot" interface. This is where Apple comes in.

> **1.    With over 200 million remote controls already in users' hands**, **all Apple needs is a TV**

The ultimate <mark>cloudified TV</mark> interface is actually a laptop, tablet, PC, or any other device …. Looked at it from this perspective, Apple already has over 200 million perfectly cloud-capable remote controls currently in the hands of users, in the form of iPhones and iPads. Now all the company needs is a TV for users to pair these remotes with. Apple also has a digital content ecosystem built around iTunes, with hundreds of millions of user's worth of credit card info on file. All of these pieces combined will make the Apple TV a very formidable competitor in the home electronics arena, and will give the company an edge over a multitude of rivals from across the digital TV/movies spectrum.

### 2. The competition?

The one real rival to Apple here is Google, which has all of the above ingredients, as well—a popular mobile platform in Android, a TV effort, Google Wallet, and content relationships….

So my money's on Apple in the TV wars, at least in the near-term. When Google delivers a tablet interface that manages to put a dent in the iPad's sales, then I'll have some hope that the company can compete in the TV market, as well.[45]

☼ ☼ ☼

## Cloud TV may replace Local TV altogether…

By cloudtweaks on December 8, 2010
in Cloud Computing, Computing, Gaming, Google Cloud, Google TV, Images, Technology, Trends, Video

**It's True, Cloud TV will most likely replace Local TV altogether**

Service providing has reached new levels since the advent of cloud computing. Now, experience games, applications and much more over the internet regardless of the device you use. Let it be an iPad or a laptop or a low end personal computer, now all you require is a browser and an internet connection to get applications, games and TV on your computer.

The concept of cloud TV is different from web television. In web television, TV service is provided. This is also known as catch up TV. Cloud TV allows a user to choose the programs he wants to watch from an archive of different programs or he can opt to stream live Television. The TV programs can be streamed to any device with an internet connection and an internet browser. This is one of the few perks clouds TV has to offer. No subscription fees need to be paid to cable operators and channel owners. There are no hardware requirements; the dish antenna on the roof and the satellite receiver sitting next to the TV are things of the past. Moreover, the variety is mouthwatering – over 2500 channels from all over the world? This is too much to handle. Services like AOL TV and MSNTV have been around for quite a while but I guess that the issue here is quality of video which is directly related to internet bandwidth.

The next question at hand is that, will cloud TV trigger local TV's demise just the way internet news and media has marked a downturn in the popularity of newspaper? Internet is no longer restricted in functionality. The only restriction in the case of cloud TV and computing is internet bandwidth. There can never be enough of it if you're trying to get high definition TV online. But as time progresses one says a steady increase in bandwidth and surely this trend will continue in the future, hence, the prospect of Cloud TV is very bright.

The concept of cloud TV seems even more promising when giants like Sony step in the arena. Recently, Sony has announced its possible launch of 'Cloud stuff'. The service will be targeting at providing entertainment, applications, games, social networking and what not. It's like tapping on a market that is likely to grow in the future. Another competitor, Google TV, has boasted that it will 'change the future of television.' Apple TV is also expecting to change the streaming TV. A product of Apple that will be based on iPhone OS 4.0, Apple TV is will support 1080 HD playback. It is news like these that show the future prospect of Cloud TV.

Clearly, it's been 50 years since television has been invented. New and improved technologies have allowed pushing the envelope as we progress but maybe it's time to reinvent the television and Cloud TV can be an answer.[46]



---

[45] wired.com/, Office Action of January 11, 2012, 15 TSDR at 6 of 36.

[46] cloudtweaks.com/, Office Action of June 6, 2011, 18 TSDR at 44-45 of 129; *see also* "Will Internet TV Kill Cable?" by Christopher Mims, May 3, 2011, technologyreview.com/

 **Microsoft**

*Faculty Connection*

# Cloud TV

This material was presented by Karin Breitman (PUC-Rio, Brazil) at the Microsoft Research Cloud Futures Workshop during April 2010 in Redmond, Washington.

*Overview*

TV is dead – at least, as we know it. The traditional model, with clear separation between roles (producers, broadcasters and consumers) is giving way to a web-based one, where users produce, distribute, combine and watch video content anywhere, anytime, and using a multitude of different devices. The Cloud will play a major role in this scenario, as it will provide the infrastructure in which to store (Iaas) and process (HaaS), platforms in which to encode and distribute (SaaS), and applications to submit, query and consume (AAAS) video content. [47]

☼ ☼ ☼

## Why Google and advertising are key to Cloud TV: Cloud IPTV needs Google TV re-births

*By Diya Soubra, SCH Consulting,* August 23, 2011

Cloud TV is coming, if only as a marketing movement rather than a revolutionary one. But what can Cloud TV do to ensure it takes off with the consumer? As Diya Soubra explains, this could be dependent on the success of Google's shift to the cloud, and whether television providers can work around the issue of target advertising.

Market trends suggest IPTV is slowly being re-launched as Cloud TV. The idea is the same – deliver TV programming over an IP link to the consumer. However, while the previous launch was not a major success from a business perspective (the revenue was limited to the subscription fee and the occasional purchase of video on demand, while the cost of the infrastructure was enormous in comparison), Cloud TV is in a better position to exploit the situation this time – if it can overcome certain hurdles.

The infrastructure is in place and the consumers have multiple screens, fixed and mobile, just ready to be used to their full potential. On the surface, one would say that not much has changed from a revenue perspective; but then the real source of revenue is different this time – advertising is the key.

IPTV failed to capture significant advertising revenue since the system was not totally in place for selling targeted, consumer profiled advertising space.

Google managed to capture billions in revenue from the global internet advertising budget by supplying the platform for inserting targeted ads. Free search results and email accounts in return for accepting to be bombarded with targeted advertisements. The platform worked well and will continue to do so going forward. The Google machine tracks all user activity on the net, with good intentions of course, in order to provide the best search results and the best matching advertisement.

And with Google TV, the company tried to expand that same model to TV consumption. *Let's do the same for TV viewers as we did for Internet users.* Track everything people watch and propose the best search results and the best advertising. The technology to insert advertisements into streaming video has existed for many years now.

---

[47] [facultyresourcecenter.com/](facultyresourcecenter.com/); *see also* "Microsoft Unites Software and Cloud Services to Power New TV Experiences," Las Vegas, January 6, 2010, [microsoft.com/](microsoft.com/), *see* Office Action of January 11, 2012, 15 TSDR at 16-19 of 36.

Unfortunately for Google and the ==Cloud TV industry==, big media stalled the launch of Google TV by denying the required streaming licenses. No streaming content means no TV. This action has indirectly stalled the success of ==Cloud TV== by removing the Google advertising platform from the picture. Without a central trusted broker for ads, the ecosystem will fall back to the ads inserted at the source of the media, just like broadcast TV.

While this may seem like the end, the recent acquisition of Motorola, with its set top box business, gives Google a whole new angle on ==Cloud TV==. They can now offer top of the line set top boxes with the associated advertising platform to all parties wishing to try their luck at licensing content and distributing it with CDN technology. This would give a boost to the CDN business and to the ==Cloud TV business==.

Starting the Cloud TV system becomes very straight forward. One has to license some content, sign up with a CDN to store and stream the content and use the set top box and advertising platform from Google to generate revenue. No infrastructure to build or maintain. End users are happy because competition will drive excellence at an affordable price.

The advertising platform is key. Imagine a world where every household gets its own specific TV advertising based on the viewing habits of its members. This is not at all farfetched – already we live in a world where Google and Facebook have a specific profile for each and every internet user out there. Tracking household viewing habits is a piece of cake in comparison.

At least, this time they need to spend less since there is no infrastructure to build – many CDN providers are ready and willing to take their money to host and deliver the content. But without the advertising revenue, ==Cloud TV operators== are repeating the same failed exercise as IPTV.[48]



It appears from the record that each competitor in this field believes that with the exponential growth in bandwidth, cloud computing may change the face of TV. In fact, consistent with the above articles discussing cloud TV's threat to traditional cable and satellite television, the record also demonstrates that the "*cloud TV* wars" among the largest competitors in the video entertainment business include a multiplicity of approaches to "TV Everywhere"[49] with Microsoft,[50], Apple,[51] Google[52]

---

[48] businesscloudnews.com/, *see* Office Action of January 11, 2012, 15 TSDR at 23-25 of 36; see also "Cloud TV causing major industry disruption," by Diya Soubra, http://www.businesscloudnews.com/, Office Action of June 6, 2011, 18 TSDR at 82-85 of 129.

[49] As seen above, "TV Everywhere" or TVE, is a business model wherein cable networks allow their customers to access content across multiple platforms (e.g., on the internet as well as on mobile devices).

[50] *See e.g.,* facultyresourcecenter.com/; *see also* "Microsoft Unites Software and Cloud Services to Power New TV Experiences," Las Vegas, January 6, 2010, microsoft.com/, *see* Office Action of January 11, 2012, 15 TSDR at 16-19 of 36.

and Amazon,[53] (to name a few key players), each having chosen its own unique approach to streaming video in ways different from each other, but all still utilizing the cloud:

### Rumor: New $100 Apple TV Takes Aim at the Cloud
by Brian X. Chen   May 28, 2010

[54]

### Report: Apple Prepping Cheap, Cloud-Based Apple TV For War With Google
by MG Siegler   May 28, 2010

[55]

Furthermore, all of the major entities mentioned above which are pursuing TVE are inevitably tied to the relative success of those third-parties streaming video over the Internet who are repeatedly showing up in the articles of record, such as Netflix[56], TiVo,[57] Aviion,[58] Sony,[59] Yahoo, YouTube, Hulu, Boxee, Roku, Vudu, etc.

---

[51] "200 million reasons why Apple's upcoming TV will win the cloud TV wars," wired.com/gadgetlab/, techcrunch.com/, and wired.com/; *see* Office Action of January 11, 2012, 15 TSDR at 6 of 36.

[52] "How the Cloud Changes TV and Why Hollywood Should Not Be Scared," by Alex Williams on August 17, 2010, readwrite.com/; and techcrunch.com/; Office Action of June 6, 2011, 18 TSDR at 4-5 of 129.

[53] "Amazon Launching 'Cloud TV'," Office Action of June 6, 2011, 18 TSDR at 118 of 129.

[54] wired.com/gadgetlab/, see Office Action of June 6, 2011, 18 TSDR at 6-15 of 129; see also "I Want My Cloud TV," arkusinc.com/, Office Action of June 6, 2011, 18 TSDR at 109-110 of 129.

[55] *Id.*; techcrunch.com/, see Office Action of June 6, 2011, 18 TSDR at 20-41 of 129; *see also* "Will Google TV Destroy TV?" by Mike Halleen, May 28, 2010, thehollywoodgeek.com/**.**

[56] "Netflix Cloud TV," www.alacrastore.com Office Action of June 6, 2011, 18 TSDR at 97-98 of 129; and "Will Internet TV Kill Cable? What happens when content is separated from the means to distribute it? Your cable company would rather not find out." by Christopher Mims, May 3, 2011. technologyreview.com/  techcrunch.com/.

[57] techcrunch.com/.

[58] *See* Office Action of January 11, 2012, 15 TSDR at 2-3 of 36.

Additionally, as suggested above, this focus on the cloud is nothing new for Applicant. In fact, in its press releases made of record, Applicant is repeatedly pointing out that its own approach, based on Applicant's proprietary technology, is different from most of its competitors:

> Since the early days of ICTV, ActiveVideo has maintained a singular focus: keep the interactive television content and intelligence in the cloud (servers and networks), so that all set-top boxes (even the lowly DCT 2000) can deliver a terrific consumer experience that every operator can be proud of …
>
> The easiest way to explain how it works is to think of your set-top box as a remote terminal, communicating with a central server. And since we're talking about television, the language is MPEG, the same standard that cable uses to transport video from the headend to the set-top box. Traditional and Web programmers and cable operators create rich, interactive content – shopping, advertising, sports, games, etc. – using standard Web tools. Active Video uses their own technology to synthesize the content as an MPEG stream and deliver it to any STB. And the existing remote control and return path are used to interact, to navigate, to select and to play.[60]

According to the record, Applicant's patented product is designed to enable pay-TV providers to offer "TV as an application" and to deliver their user interfaces to digital TV tuners and IP cable set-tops, Internet-connected TVs and other devices, gaming consoles and specialized streaming boxes, requiring at most a thin software "client" that can be installed in current set-top boxes. The following images from Applicant illustrate this visually:

---

[59] "Sony Shows the Perils of Cloud TV …," lcdtv.net/, Office Action of June 6, 2011, 18 TSDR at 79-80 of 129.

[60] "The iTV Doctor is In! How ICTV Morphed into ActiveVideo Networks," April 15, 2010, itvt.com/



61

62

## V. *What is a "generic term"?*

A generic term refers to the common descriptive name of a class or "genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 329 (1985); *see also In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1111-12 (Fed. Cir. 1987) (*"Gould Paper"*)

---

[61] *Id.*

[62] ActiveVideo CloudTV — Unleash Your UI, youtube.com/watch, Second Villalpando Dec. at ¶ 17; Ex. K to Second Villalpando Dec., 17 TSDR.

(**SCREENWIPE** held generic as applied to television and computer screen pre-moistened cleaning wipes). An alleged mark is a generic term if it is used or understood by the relevant public primarily to refer to the class or category of goods and/or services on or in connection with which it is used. *E.g.*, *In re Nordic Naturals, Inc.*, ___ F.3d ____, ___ USPQ2d ____, 2014 WL 2808082, at *1 (Fed. Cir. June 23, 2014); *H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). Refusal of an application is appropriate if the applied-for mark is generic for any of the identified goods or services; it need not be generic for all of them. *See Chamber of Commerce*, 102 USPQ2d at 1219. Whether a proposed mark is generic depends upon its primary significance to the relevant public. 15 U.S.C. § 1064(3); *see also Bellsouth Corp. v. DataNational Corp.* 60 F.3d 1565, 35 USPQ2d 1554, 1557-58 (Fed. Cir. 1995).

Evidence of the relevant public's understanding of a term may be obtained from any competent source, including dictionary definitions, trade journals, newspapers, websites, and other publications. *Reed Elsevier*, 82 USPQ2d at 1380 (**LAWYERS.COM** is generic for providing an online interactive database featuring information exchange in the fields of law, legal news, and legal services, citing to Applicant's website, third-party websites and numerous URLs containing the letter string "lawyers.com"); *In re Northland Aluminum Products, Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985) (**BUNDT** is not registrable for "ring cake mix," citing to numerous cookbook recipes and newspaper articles).

## VI.    *The two-part genericism test*

"The genericness inquiry is made according to a two-part test: 'First, what is the genus of goods or services at issue? Second, is the term sought to be registered ... understood by the relevant public primarily to refer to that genus of goods or services?'" *Reed Elsevier*, 482 F.3d 1376, 82 USPQ2d at 1380 (citation omitted).

Using sources such as dictionary definitions, trade journals, newspapers and other publications, the Office has undertaken the burden of demonstrating by clear evidence that members of the relevant public perceive "CloudTV" to be a generic designation for television (and other audiovisual and multimedia content encompassed by Applicant's identification) provided through a video-on-demand service to consumers having screens connected to the Internet. *See, e.g., In re Hotels.com LP*, 573 F.3d 1300, 91 USPQ2d 1532, 1533-34 (Fed. Cir. 2009) (**HOTELS.COM** is generic for online lodging information and reservation services).

In spite of the large amount of evidence placed into the record by the Trademark Examining Attorney, Applicant argues that inasmuch as it actually coined this asserted mark, "CloudTV," it cannot be a generic term when used in connection with ActiveVideo's software and related services. However, even if Applicant was the first user, merely being the first user of a term does not entitle an applicant to register such a term or phrase as a mark. *See, e.g., In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987) ("To allow trademark protection for generic terms, *i.e.*, names which describe the genus of goods being sold, even when these have become identified with a first user, would

grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."); *cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (trademark law does not countenance someone obtaining "a complete monopoly on use of a descriptive term simply by grabbing it first") (citation omitted); *In re National Shooting Sports Foundation, Inc.*, 219 USPQ 1019, 1020 (TTAB 1983).

### VII.     *What is the genus of goods and services?*

As noted above, our first task is to determine, based upon the evidence of record, the genus of Applicant's goods and services. In doing so, we may consider evidence provided from Applicant's website and press releases, from third-party websites, and from dictionaries, newspapers articles and other such sources. *See In re Reed Elsevier,* 82 USPQ2d at 1380 (approving the Board's review of the subject website); *In re Steelbuilding.com*, 415 F.3d 1293, 1298, 75 USPQ2d 1420 (Fed. Cir. 2005) (examining the subject website in order to understand the meaning of terms for which coverage was sought and thereby define the genus of covered services).

We turn then to the identification of goods in Int. Class 9 and the recitations of services in Int. Classes 38, 41 and 42, along with their respective specimens of use. The identification of goods and recitation of services contains a detailed listing of the definite and acceptable wording as worked out during examination between Applicant and the Trademark Examining Attorney. However, in determining the genus of Applicant's goods and services, we need to consider the central focus of Applicant's products and services without the confusion of a verbose recitation of

the entire listing of goods and services. *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of services set forth in the certificate of registration."); *cf. In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1438 (TTAB 2005) (where an applicant's website offers interrelated, interactive and largely undifferentiated services, a tribunal can take all of those into consideration when determining the relevant genus of services despite that applicant's tactical decision to carve "wagering on sporting events" out of its recitation of service).

Distilling the essence of Applicant's four classes, we focus on (i) software that facilitates smart TVE for the connected consumer; (ii) television broadcasting and telecommunications services for customers via a video-on-demand service employing network-based media processing software; (iii) the provision of non-downloadable multimedia content; and (iv) Internet access, product development, technical consultation and troubleshooting of its software, and facilitating online purchasing from a variety of devices.

The common thread among all these groups of services is Applicant's ability to provide television (and other audiovisual and multimedia content) using a video-on-demand service to consumers with electronic devices having screens, which devices are connected to the Internet. As seen throughout this record, while many competitors are limited by the user interfaces (UIs) that are resident in old cable-company set-top boxes, Applicant uses software residing in the cloud to help cable operators smoothly and consistently deliver a rich source of media and content to

customers who are often still navigating channels and content using a standard television and legacy remote control.[63] Applicant calls this the "write-once, deploy-everywhere" content creation environment.[64] As stressed in the oral hearing, Applicant's approach does the heavy lifting and rendering in the head-end, or another form of the "cloud," and delivers the video content and the UI to those old set-top boxes together in a faster video stream.

Applicant's press releases, as reflected almost verbatim in online articles of record, are directed to operators of multiple cable or direct-broadcast satellite television systems (multiple systems operators or MSOs), Internet service providers (ISPs), CE manufacturers, content providers, web-developers/programmers and advertisers, just as clearly as they are directed to the ultimate consumers of televised media. These press releases and subsequent articles repeatedly use terms like "Television in the cloud,"[65] "cloud-based platform,"[66] "an application platform in the cloud,"[67] "moving the TV-viewing experience to the cloud,"[68] "distribute content from the cloud,"[69] "the network cloud,"[70] benefits of "cloud-based processing,"[71]

---

[63] "Cloud TV: ActiveVideo Networks": fiercecable.com/, October 19, 2010.

[64] *See e.g.,* Applicant's response of December 2011, 17 TSDR at 42, 43 and 44 of 201.

[65] "Television in the Cloud: ActiveVideo's Jeff Miller at NewTeeVee Live," posted on November 10, 2010, by Rob Hof, robhof.com/, Office Action of November 15, 2010, 21 TSDR at 15-17 of 71, and Applicant's response of December 7, 2011, 17 TSDR at 192-193 of 201.

[66] *Id*.

[67] *Id*.

[68] "Cloud TV: ActiveVideo Networks": fiercecable.com/, October 19, 2010.

[69] *Id*.

[70] "ActiveVideo President and CEO Calls on Industry to 'Join The Cloud': Urges Network-Based Platform to Speed Adoption of Web Video on TV," San Francisco, Nov. 11, 2010, prnewswire.com/, 21 TSDR at 18-19 of 71, and 17 TSDR at 194-95 of 201.

cloud-based UIs," "doing the heavy processing in the cloud,"[72] and an "advanced TV software platform based entirely in the cloud."[73]

In the case at bar, the Trademark Examining Attorney has established Applicant's positioning in the rapidly-expanding field of *streaming video online, interactive television,* and/or *cloud-based television programming service to Internet-connected TVs*.[74] More specifically, as discussed above, there is a common thread woven throughout Applicant's listed goods and services involving *television (and other audiovisual and multimedia content) provided through a video-on-demand service to consumers having screens connected to the Internet*.[75] In addition, Applicant has suggested terms such as "*software platform for broadcasting multimedia via video-on-demand*"[76] or "*designing software to provide interactive television*." We find that all of the *italicized* phrases in this paragraph represent several understandable phrases used by applicant to capture the essence of the *genus* involved herein, using somewhat fewer words than is required by the Office

---

[71] *Id.*; "ActiveVideo Moves UI to the Cloud to Unify Guide Experiences," June 10, 2013, Posted by Will Richmond, videonuze.com/.

[72] *Id.*

[73] "ActiveVideo Networks Licenses CloudTV Platform To Comcast," June 12, 2012.

[74] *See* International Class 41 recitation of services, *supra. Also see* e.g., Applicant's response of December 7, 2011, TSDR #17 at 46, 66, 122-160, 184-188, 196 & 200 of 201.

[75] *See* International Class 38 recitation of services, *supra. Also see e.g.,* Applicant's response of December 7, 2011, TSDR #17 at 42, 48, 66, 122-160, 184-191 of 201.

[76] *See* International Class 9 identification of goods, *supra. Also see e.g.,* Applicant's response of December 7, 2011, TSDR #17 at 41, 47, 58, 66, 122-160, 184-188, 194 &198 of 201.

in order for this Applicant to present a definite identification of goods and recitation of services.[77]

## VIII.  *Does the relevant public understand "CloudTV" primarily to refer to those classes of goods and services?*

In order to determine whether the designation **CLOUDTV** is understood by the relevant purchasing public primarily to refer to the named genera of goods and services, we must define the "relevant purchasing public." Certainly, ISPs and pay-TV providers including MSOs and CE manufacturers will be among the most prominent customers of Applicant's "highly specialized," "cutting edge" goods and services. On the other hand, hundreds of thousands, if not millions, of consumers within the United States will have seen this designation on their television screens.[78] Accordingly, we find that the relevant public consists of a very broad group of persons, ranging from the executives of MSOs to the ordinary consumers of TV content and other multimedia products.

---

[77] It is useful to recognize that the analytical step of defining the "genus" is not an end in itself, but a means towards determining whether a term is generic, *i.e.*, whether consumers understand the term at issue as primarily referring to the goods or services (rather than to the source).  As such, the genericness inquiry is not conducted in the abstract, but focuses on the description of goods or services in the application, *see Magic Wand*, 940 F.2d 638, 19 USPQ2d at 1552, and how consumers would perceive the mark (or portion of the mark) in connection with those goods or services. *See, e.g., Remington Prods. Inc. v. North Am. Philips Corp.*, 892 F.2d 1576, 13 USPQ2d 1444, 1448 (Fed. Cir. 1990) (assessing descriptiveness and genericness by looking at how a consumer would perceive the mark "in connection with the products"). Sometimes an applicant's description of goods/services is simple and clear enough that it may be used verbatim as the "genus." Other times, as in this case, distillation of a complicated or lengthy description of goods/services into a clear, more succinct "genus" greatly facilitates the determination of whether a term is generic.

[78] Third declaration of Edgar Villalpando, dated July 10, 2012, as attached to Applicant's response of July 11, 2012, ¶¶ 6, 11 and 12, 14 TSDR at 29, 31 of 52. Applicant said its software client is now deployed on more than ten million devices, including consumer electronics boxes sold at retail.

When these two generic terms, "Cloud" and "TV," are combined into "CloudTV," the question still remaining is whether each word retains its generic meaning such that "the separate words joined to form a compound have a meaning [to the relevant public] identical to the meaning common usage would ascribe to those words as a compound." *See Gould Paper* 5 USPQ2d at 1111-12: "In other words, if the compound word would plainly have no different meaning from its constituent words, and dictionaries, or other evidentiary sources, establish the meaning of those words to be generic, then the compound word too has been proved generic. No additional proof of the genericness of the compound word is required." *American Fertility Society,* 51 USPQ2d at 1836; *see also Gould Paper*, 5 USPQ2d at 1111-12; *In re Wm. B. Coleman Co.,* 93 USPQ2d 2019, 2021 (TTAB 2010). The Trademark Examining Attorney argues that inasmuch as Applicant's goods and services "utilize Internet-based '*cloud*' technology to delivery web content to *televisions*," the new term remains generic, and the combined term does not convey a different, non-generic meaning.

Based on the factual record in this case, we disagree with Applicant's arguments that while "[t]he terms 'cloud' and 'cloud computing' have meaning in relation to computing, … these terms are incongruous in connection with the television services provided by cable companies and the like." Applicant's brief at 9. To the contrary, we agree with the Trademark Examining Attorney that the evidence of record clearly shows that "Cloud TV," the compound created by the combination of the individually generic terms "cloud" and "tv," is itself generic inasmuch as no new

meaning beyond the individual meaning of the components is created by the combination. The resulting term simply refers to a software platform for broadcasting multimedia content via video-on-demand; it does not serve to identify a single source of such a platform.

Applicant points out that the Trademark Examining Attorney has provided no dictionary listings for "cloudtv" or "cloud tv." But the presence or absence of a term in dictionaries is not controlling on the question of whether a term is generic. *See Gould Paper*, 5 USPQ2d at 1112 (**SCREENWIPE** found to be a generic term based on dictionary definitions of the individual terms "Screen" and "Wipe" and the applicant's own description of the product on its specimen). We note that the record contains ample evidence of purchaser understanding establishing the meaning of "cloud TV" in relation to the goods and services at issue. For example, reporters and writers in this specialized field clearly use the terminology "cloud TV" to refer to similar technology used on the same range of devices and attendant services that are involved in this application. Given that the era of streaming digital media is relatively new, Applicant may very well be on the leading edge of competitors in this field having the capability to allow pay-TV providers to deploy a full user interface that is streamed entirely from the cloud. Nonetheless, we find that similar computer programs and telecommunication services have been described by the industry press as "cloud TV" without lots of explanatory materials of what this term means. Such evidence strongly indicates that this combined term is generic with respect to Applicant's goods and services. These examples of industry writers using

the term "cloud TV" as a discrete category of goods and services are persuasive evidence that the relevant consumers perceive the term as generic. *Continental Airlines Inc. v. United Airlines Inc.*, 53 USPQ2d 1385, 1395 (TTAB 1999) (variety of printed publications demonstrate widespread use of the term "e-ticket" in a generic manner making clear that members of the relevant public use and understand the term "e-ticket" to refer to Applicant's computerized reservation and ticketing services). The Board has often held that a term that names the "central focus" or "key aspect" of goods and/or services is generic for the goods/service themselves, and the Board's principal reviewing Court has approved this approach. *Hotels.com LP,* 91 USPQ2d at 1533-34 (approving Board's finding that the word "hotels" identifies the "central focus" of online lodging information and reservation services, rendering the mark **HOTELS.COM** generic). See also *In re Web Communications*, 49 USPQ2d 1478 (TTAB 1998) (**WEB COMMUNICATIONS** is generic for publication and communication via the web, and also for consulting services directed to assisting customers in setting up their own websites for such publication and communication); *In re Harcourt Brace Jovanovich, Inc.*, 222 USPQ 820 (TTAB 1984) (**LAW & BUSINESS** is generic for services of arranging and conducting seminars in the field of business law); *In re A La Vieille Russie, Inc.*, 60 USPQ2d 1895 (TTAB 2001) (**RUSSIANART**, being generic for a particular type of art is also generic for dealership services directed to that field); *In re Tires, Tires, Tires Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009) (the word "tires" is the generic name of the goods sold, and inasmuch as tires are also a "key aspect" of applicant's services, **TIRES TIRES TIRES**

was found to be generic for the retail sales services); *In re Candy Bouquet International, Inc.*, 73 USPQ2d 1883 (TTAB 2004) (because **CANDY BOUQUET** is generic for gift packages of candy, it is also generic for applicant's retail, mail and computer ordering services therefor); and *In re Log Cabin Homes Ltd.*, 52 USPQ2d 1206 (TTAB 1999) (**LOG CABIN HOMES** is generic for a type of building and is also generic for architectural design services directed to that type of building and for retail outlets featuring kits for construction of that type of building).

Therefore, we affirm the Office's genericness refusal in this case because the Trademark Examining Attorney has established by clear evidence that the wording "Cloud TV" is a compound term that names the "central focus" or "key aspect" of Applicant's goods and services, and hence is a generic term. *See Northland Aluminum*, 227 USPQ at 963-64 (holding **BUNDT** generic for cake mix); *In re Cent. Sprinkler Co.*, 49 USPQ2d 1194, 1199 (TTAB 1998) (holding **ATTIC** generic for automatic sprinklers for fire protection used primarily in attics); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 292, 1 USPQ2d 1364, 1365 (3d Cir. 1986) (holding **CHOCOLATE FUDGE** generic for diet sodas). The examples that the Trademark Examining Attorney has placed into the record show that the designation "Cloud TV" "tell[s] you *what the thing is.*" *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring).

We also note that minor variations, such as spacing and upper- versus lower-case letters, in the display of a generic term (e.g., "cloud TV," "Cloud TV," "CloudTV" or "CLOUDTV") typically are legally insignificant and do not avoid a

finding of genericness. *See In re Noon Hour Food Prod. Inc.*, 88 USPQ2d 1172, 1173 n.2 (TTAB 2008) (**BOND-OST** generic for a type of cheese).[79]

On the issue of genericness, we find that Applicant's various contentions in its briefs are based upon evidence subject to interpretation, and that this advocacy is simply not sufficient to rebut the Office's clear showing. We find no evidence that Applicant's compressed version of "CloudTV" has another meaning or would be perceived as anything other than a reference to "cloud TV" as used in the multiplatform interactive television industry press. The fact that Applicant may be the first user of a compressed version of a generic designation does not justify registration if the only significance conveyed by the term is that of the category of goods and services. Even if we were to presume that third-party competitors embracing new video delivery options by offering advanced smart digital products (viz., several instances discovered by the Trademark Examining Attorney and confirmed by Applicant) may have adopted similar versions of this same terminology subsequent to Applicant's first use thereof, that usage does not justify registration if the evidence shows that the term is generic. *See In re Greenliant Sys. Ltd.*, 97 USPQ2d 1078, 1083 (TTAB 2010) (Term **NANDrive** is generic for applicant's electronic integrated circuits); and *In re Nat'l Shooting Sports Found., Inc.*, 219

---

[79] *See also Weiss Noodle Co. v. Golden Cracknel and Specialty Co.,* 290 F.2d 845, 129 USPQ 411 (CCPA 1961) (**HA-LUSH-KA** held to be the generic equivalent of the Hungarian word "haluska"); *In re Vanilla Gorilla L.P.,* 80 USPQ2d 1637 (TTAB 2006) (**3-0's** is descriptive of automobile wheels having thirty-inch rims); *In re Wynadotte Chemicals Corp.,* 155 USPQ 100 (TTAB 1984) (**TES-TED** is merely descriptive for detergents that have been subjected to tests).

USPQ 1018, 1020 (TTAB 1983) (**SHOOTING, HUNTING, OUTDOOR TRADE SHOW AND CONFERENCE** is generic for applicant's trade shows).

Applicant argues that there are other generic designations available for competitors to use in naming their goods and services, and that these alternative names indicate that there is no competitive need among others to use Applicant's alleged mark in connection with their goods or services. In this context, Applicant recites the terms "software platform for broadcasting multimedia via video-on-demand" or "software for providing interactive television." However, it is recognized that there may be more than one generic name for a product or service. *See Clairol, Inc. v. Roux Distributing Co.*, 280 F.2d 863, 126 USPQ 397, 398 (CCPA 1960) ("The same merchandise may, and often does, have more than one generic name."); *see also Continental Airlines*, 53 USPQ2d at 1394 (the term **e-ticket** is a generic term for computerized reservation and ticketing of transportation services); *In re Recorded Books, Inc.*, 42 USPQ2d 1275, 1281 (TTAB 1997) (**RECORDED BOOKS** is generic for "pre-recorded audio tape cassettes featuring literary works); *In re Sun Oil Co.*, 426 F.2d 401, 165 USPQ 718, 719 (Rich, J. concurring) (CCPA 1970) (**CUSTOM-BLENDED** generic for gasoline). Indeed, any term that the relevant public understands to refer to the genus of "software platform for broadcasting multimedia via video-on-demand" or "software for providing interactive television," in this case CLOUDTV, is also generic. *In re 1800Mattress.com IP LLC*, 586 F3d 1359, 92 USPQ2d 1682, 1685 (Fed Cir. 2009) (the term **mattress.com** is generic for "online retail store services in the field of mattresses, beds, and bedding"). And, as a marketplace

reality, the apt term "Cloud TV" is much shorter and more nimble than the cumbersome phrases that Applicant offers as generic alternatives.

Finally, we have carefully considered all of the evidence and arguments submitted by the Trademark Examining Attorney and by Applicant on the issue of genericness, including those that we have not specifically discussed. We conclude that the Trademark Examining Attorney has met her burden of demonstrating by clear evidence that **CLOUDTV** is a generic term for the goods and services identified in this case. Because the term **CLOUDTV** is generic when used in connection with the goods and services in the application, it is not registrable on the Supplemental Register or on the Principal Register under the provisions of Section 2(f).

## IX.    *Mere Descriptiveness*

Turning to the alternative refusal under Section 2(e)(1), implicit in our holding that the evidence before us establishes that **CLOUDTV** is generic for Applicant's goods and services is a finding that **CLOUDTV** is at least merely descriptive of Applicant's goods under Section 2(e)(1). "The generic name of a thing is in fact the ultimate in descriptiveness." *BellSouth*, 35 USPQ2d at 1557; *Weiss Noodle,* 129 USPQ at 413.

Applicant argues that **CLOUDTV** is an imaginative play on words that is suggestive, not merely descriptive":

> CLOUDTV taps into the light, free-floating and without boarders images associated with clouds. … ActiveVideo drives this home with the tagline "CloudTV … don't let the box hold you back." Playing up the double-meaning and allusion to the well-known saying "thinking outside

the box," the marketing message is provided on a backdrop of wispy, white, nebulous clouds.[80]

Suffice it to say we do not find this argument persuasive. As seen earlier, Applicant is not the only enterprise in the field of computers, high technology and telecommunications to use cloud imagery. At this point, in Applicant's field, cloud imagery like the word "cloud" has taken on a clear meaning. We have seen from industry press and dictionary entries that both the cloud imagery and terminology immediately convey information to potential consumers about a significant feature of the involved goods or services. Hence, it does not convey more than this one meaning. As noted earlier, no new meaning beyond the individual meaning of the components is created by the combination. Therefore, in this case, we find that **CLOUDTV** is not an imaginative play on words, the term is still highly descriptive, and is not entitled to registration.

While Applicant is correct that we must resolve any lingering doubts we may harbor about "mere descriptiveness" in Applicant's favor, based on the record herein, we have no doubt that **CLOUDTV** is at least merely descriptive (or as we found earlier, generic). Therefore, there is no doubt to resolve.

### X. *Acquired Distinctiveness*

Of course, a generic term cannot be appropriated exclusively as a trademark irrespective of the length of use or level of promotional efforts. However, Applicant

---

[80] Quotation taken from Applicant's brief at 18, in turn taken from Applicant's ads featured in the June 18, 2012, issues of Multichannel News (multichannel.com/) and Broadcasting & Cable (broadcastingcable.com/), Third Villalpando Decl. at ¶ 10, 14 TSDR at 30 of 52.

has argued in the alternative that, in the event its alleged mark should be found not to be generic but to be merely descriptive, it has acquired distinctiveness as a result of its use of the term, and that registration is, therefore, sought under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f) and 37 C.F.R. § 2.41(b).

For the sake of completeness, should a reviewing court find the term **CLOUDTV** not to be generic, we turn finally to the issue of whether Applicant's mark has acquired distinctiveness. Distinctiveness is acquired when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quotation omitted).

In finding earlier in this decision that the designation **CLOUDTV** is incapable of being a source identifier for Applicant's goods and services, we have considered all of the evidence touching on the public perception of this designation, including the evidence of acquired distinctiveness. As to acquired distinctiveness, Applicant has the burden of establishing a *prima facie* case. *See In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 422 (Fed. Cir. 1985); *In re Gammon Reel, Inc.*, 227 USPQ 729, 730 (TTAB 1985). Additionally, the greater the degree of descriptiveness, the greater the evidentiary burden on the user to establish acquired distinctiveness. *Steelbuilding.com*, 75 USPQ2d at 1424; *Merrill Lynch,* 4 USPQ2d at 1143; and RESTATEMENT (THIRD) OF UNFAIR COMPETITION (1993), Section 13, comment e. We also bear in mind that "[t]he ultimate test in determining whether a designation has acquired distinctiveness is applicant's

success, rather than its efforts, in educating the public to associate the proposed mark with a single source." TMEP § 1212.06(b); *see also Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 28 USPQ2d 1287, 1291 (9th Cir. 1993) ("While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it.").

In support of its position, Applicant submitted three different declarations of Edgar Villalpando, Applicant's Senior Vice President of Marketing (along with attached exhibits), alleging that the term **CLOUDTV** has acquired distinctiveness under Section 2(f) of the Trademark Act. In response, the Trademark Examining Attorney argues that should the designation "CloudTV" be found not to be generic, Applicant has failed to make a sufficient showing of acquired distinctiveness under Section 2(f) of the Act.

We agree with the Trademark Examining Attorney that the designation **CLOUDTV** is, at best for Applicant, highly descriptive. Hence, even if the designation **CLOUDTV** were found on appeal not to be generic, given the highly descriptive nature of the designation **CLOUDTV**, we would need to see a great deal more evidence (especially in the form of direct evidence from the relevant classes of purchasers that they view the term "CloudTV" as a source-identifier, or other circumstantial evidence) than what Applicant has submitted in order to find that

the designation has become distinctive of Applicant's goods and services.[81] Applicant claims that the term "CLOUDTV" has become distinctive of Applicant's goods and services based upon its continuous and exclusive use in commerce. As noted above, this evidence involves three declarations provided by its Vice President of Marketing, with attached photographs of trade show exhibits, press releases circulated by Applicant, and various other promotional materials provided by Applicant. The conclusory statements contained in the declarations recount Applicant's commercial successes in this field, but fail to establish its success in educating the public to associate the applied-for term with a single source or that the purchasing public has come to view this alleged mark as an indicator of origin. For example, Applicant has not provided contextual information about the significance of its sales volume such as the market share it has for its goods and services sold in the United States, any polling data, etc.

We hasten to add that based upon this record, we have no doubt that Applicant is a significant player in the field of multiplatform interactive television. It has spent millions of dollars on publicity and other marketing efforts since April 2009 to promote its goods and services marketed under the "CloudTV" designation to its customers and potential customers. Applicant's customers include major players in television and media industries. Applicant's success in these industries appears to

---

[81] We do not agree with the position of the previous Trademark Examining Attorney that Applicant must have a showing of five years of use prior to making a claim under Section 2(f) of the Act. Clearly, acquired distinctiveness may be found with less than five years of use. Trademark Rule 2.41(b) merely suggests that substantially exclusive and continuous use in commerce by Applicant for the five years before the date on which the claim of distinctiveness is made may, under appropriate circumstances, be considered *prima facie* evidence of acquired distinctiveness.

be due in part to the proprietary, cutting-edge technology it has employed.[82] However, highly descriptive terms are less likely to be perceived as trademarks and are more likely to be useful (if not necessary) to competitors than are less descriptive terms. More substantial evidence of acquired distinctiveness thus will ordinarily be required to establish that such a term truly functions as a distinctive source indicator for Applicant's goods and services.

*Decision*: Accordingly, taking into consideration the entire record herein, all three alternative refusals to register Applicant's mark **CLOUDTV** are affirmed as to all four classes of goods and services. We find that this term is generic; in the alternative, if this term should be found not to be generic, we find that the term is highly descriptive, and that Applicant has failed to make a sufficient showing of acquired distinctiveness under Section 2(f) of the Act to permit registration of this term on the Principal Register.

---

[82] We also note that to the extent proprietary technology has lessened competitors' strength in this field, any *de facto* acquired distinctiveness demonstrated by Applicant would be unavailing against a finding of genericness. *See In re Pennington Seed Inc.*, 466 F.3d 1053, 80 USPQ2d 1758, 1762 (Fed. Cir. 2006).